UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 5:24-CR-260-1 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| TIMOTHY BURGMAN, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Before the Court is Defendant Timothy Burgman's ("Burgman" or "Defendant") Motion to Suppress all evidence seized as result of a traffic stop on June 7, 2024. (Doc. 35.) The government responded in opposition. (Doc. 39.) On February 14, 2025, the Court conducted an evidentiary hearing on the motion. For the reasons stated herein, Defendant's Motion to Suppress is DENIED.

I.  BACKGROUND

Two witnesses testified at the evidentiary hearing. Agent Neil Laughlin testified about the narcotics investigation giving rise to the encounter with Burgman and his co-defendant, Shawn Pouliot ("Pouliot"), and the marked lane violations justifying the traffic stop. Trooper Jordan Hershman testified about his enforcement role that morning, the circumstances of the traffic stop, and deployment of a narcotics detection K9.

### A.     Agent Neil Laughlin

Agent Laughlin was a Trooper with the Ohio State Highway Patrol ("OSHP") for over 22 years.  He is presently employed by the Medina County Drug Task Force and is a sworn task force officer with the Federal Bureau of Investigation's Akron Safe Streets Task Force.  His current assignments involve covert felony drug investigations.  His also assists partner agencies in narcotics-related investigations.

On June 7, 2024, Agent Laughlin was told MEDWAY Drug Enforcement Agency ("MEDWAY"), a law enforcement agency serving Wayne County, was investigating a suspected drug trafficker.  MEDWAY learned the suspect was traveling in an older model, silver Chevy Trailblazer.  The suspect had gone out of state to pick up narcotics and would be returning sometime that morning.

Agent Laughlin was to remain covert.  He was assigned an unmarked car and was wearing plain clothes.  He parked along U.S. Route 30 ("U.S. 30") in Wayne County.  All assigned officers were communicating by encrypted radio.  At approximately 3:30 a.m., Agent Laughlin heard another officer report the suspect's Trailblazer was traveling eastbound on U.S. 30.  After the Trailblazer passed, Agent Laughlin pulled into the left lane and followed behind the Trailblazer.  The Trailblazer was in the right lane.  Agent Laughlin first observed the car traveling below the posted speed limit.  Still in the left lane, Agent Laughlin pulled closer to the Trailblazer.  While in close proximity, Agent Laughlin saw the Trailblazer cross the dotted lane lines.  No turn signal was used.  There were no obstructions causing drivers to cross into the left lane.  Agent Laughlin saw the car cross into the left lane by a tire width or more.  Based on his training and experience, the two observed instances of crossing into the left lane were marked lane violations.

Agent Laughlin communicated the marked lane violations to the other officers, including Trooper Jordan Hershman. Agent Laughlin saw Trooper Hershman pull the Trailblazer over. He remained in the area only long enough to confirm Trooper Hershman's safety.

**B.    Trooper Jordan Hershman**

Trooper Hershman has been with OSHP for seven years. His duties include enforcing traffic laws and assisting narcotics interdiction efforts. Even when on the road to assist with interdiction efforts, Trooper Hershman testified he is always enforcing traffic violations. Trooper Hershman is also a certified K9 officer. In his seven years with OSHP, Trooper Hershman has conducted approximately 4,000 to 5,000 stops to enforce traffic laws. These stops typically take approximately 10 to 15 minutes to complete.

On June 7, 2024, Trooper Hershman's patrol included assisting MEDWAY with its narcotics investigation. He and Trooper Giraldo were in a marked Chevy Tahoe on U.S. 30. Topper Hershman heard Agent Laughlin call in the marked lane violations. When Trooper Hershman saw the identified Trailblazer, he got in position behind the car and activated the lights. The Trailblazer pulled onto the right shoulder of the road. Two other OSHP vehicles pulled over. Agent Koch and his assigned K9 were in one of those vehicles. The traffic stop was captured by Trooper Hershman's Dash Camera (Def't Ex. A) and Body Camera (Def't Ex. B).

The Dash Camera begins as Trooper Hershman pulled to the side of the road behind the Trailblazer. (Def't Ex. A at 3:28:18.) The Body Camera begins as Trooper Hershman approached the driver's side of the Trailblazer. (Def't Ex. B at 3:30:06.)

Trooper Hershman initiated the traffic stop. (*Id.* at 3:29:47.) After pulling the Trailblazer over, Trooper Hershman approached the vehicle on the driver's side. (*Id.* at 3:30:06.)

3

The driver's window was down.  (*Id.*)  As Trooper Hershman addressed Pouliot, the driver, he noticed another man in the passenger seat.  (*Id.* at 3:30:18-3:30:27.)  Pouliot provided his driver's license.  (*Id.* at 30:30:28.)  Trooper Hershman told Pouliot they had received calls about the vehicle "going in and out of [the] lane a little bit."  (*Id.* at 3:30:35.)  Pouliot explained he had been out of town and was tired because he drove a straight eight hours.  (*Id.* at 3:30:40-3:30:55.)

Trooper Hershman asked the passenger for identification.  (*Id.* at 3:30:56.)  The passenger said he did not have any identification on him.  (*Id.* at 3:30:59.)  Speaking to Pouliot, Trooper Hershman explained he would be running Pouliot's information.  (*Id.* at 3:31:01.)  At Trooper Hershman's direction, Pouliot got out of the Trailblazer and was escorted to Trooper Hershman's vehicle.  (*Id.* at 3:31:19-3:31:46.)  Before getting in, Trooper Hershman conducted a pat down search.  (*Id.* at 3:31:51-3:32:06.)  Trooper Hershman can be seen clearing papers from the front seat before Pouliot got into the vehicle.  (*Id.* at 3:32:18.)  While clearing the papers, Trooper Hershman asked Pouliot where they were coming from.  (*Id.* at 3:32:22.)  Pouliot responded, "We went to Indianapolis."  (*Id.* at 3:32:23.)  Trooper Hershman asked what he did there and Pouliot shared, "I was checking out some . . . sports cards that I deal with."  (*Id.* at 3:32:28.)  Pouliot further explained they left Indianapolis around 1:00 a.m. and were driving directly back to the area.  (*Id.* at 3:32:34-3:32:44.)  Trooper Hershman closed the door.  (*Id.* at 3:32:52.)

Several events are unfolding at the same time, all of which are captured in the recordings. Trooper Hershman walked back toward the Trailblazer and can be heard speaking with Trooper Giraldo.  (*Id.* at 3:32:54.)  The passenger, Burgman, was exiting the Trailblazer at the same time. (*Id.* at 3:33:10.)  The recording captures another officer tell Burgman to walk towards the second patrol car.  (*Id.* at 3:33:17.)  As Burgman walked, Trooper Hershman spoke with Burgman.  (*Id.*

4

at 3:30:20-3:30-41.)  He asked Burgman where they were coming from.  (*Id.* at 3:33:25.)  Burgman said Indianapolis.  (*Id.* at 3:33:31.)  Trooper Hershman asked Burgman what they did there.  (*Id.* at 3:33:33.)  Burgman responded, "He came and picked me up," adding "I was at my cousin's."  (*Id.* at 3:33:35-3:33:37.)

As Burgman was walking to the second car and speaking with Trooper Hershman, the K9 was walked to the Trailblazer.  (Def't Ex. A at 3:33:38.)  As the K9 began its sniff of the Trailblazer, Trooper Hershman was getting back into the car with Pouliot.  (*Id.* at 3:33:40-3:33:49.)  The K9 was rewarded after hitting on the Trailblazer.  (*Id.* at 33:33:53.)  So, 3 minutes and 53 seconds after the Trailblazer came to a complete stop on the side of the road, the K9 detected narcotics in the vehicle.  (*Id.* at 3:30:00-3:33:53.)

## II. LAW AND ANALYSIS

### A. The Traffic Stop

The Fourth Amendment guards against unreasonable seizures.  *Camara v. Mun. Ct. of San Francisco*, 387 U.S. 523, 528 (1967).  "An ordinary traffic stop by a police officer is a 'seizure' within the meaning of the Fourth Amendment."  *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).  Officers have probable cause under the Fourth Amendment to stop a vehicle when a traffic violation is observed.  *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (en banc); *see also United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010) ("there is nothing 'unreasonable' about stopping a vehicle whose driver has just committed a traffic violation") (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)).  The lawfulness of the stop hinges on whether the officer had probable cause or reasonable suspicion of a violation, not whether the violation in fact occurred.  *See United States v. Sanford*, 476 F.3d 391, 395-96 (6th Cir. 2007).

Ohio Rev. Code § 4511.33 addresses marked lane violations: "A vehicle or trackless trolley shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety." Ohio Rev. Code § 4511.33(A)(1). So long as the officer has a reasonable belief the traffic violation has occurred, the traffic stop is lawful. *United States v. Stevenson*, 43 F.4th 641, 645-46 (6th Cir. 2022)

The Court finds Agent Laughlin to be a credible witness. He has served in law enforcement for more than 24 years, with 22 of them as an OSHP Trooper. His training and experience as a Trooper supports his qualifications to properly observe and identify a marked lane violation. His credible testimony establishes the traffic stop was supported by probable cause.

Burgman's effort to characterize the stop as unlawfully predicated on something other than the marked lane violation is meritless. A stop can be pretextual if it is credibly demonstrated the officer had probable cause. *Whren*, 517 U.S. at 813; *Ferguson*, 8 F.3d at 391. Thus, even if the Trailblazer was stopped as part of a narcotics interdiction effort, the stop did not violate the Fourth Amendment because officers had probable cause to believe a traffic violation occurred.

Burgman's challenge to Agent Laughlin's credibility is also unavailing. Agent Laughlin credibly explained his covert role necessitated using an unmarked car and wearing only street clothes (no identifiable insignias or body camera). While Burgman has made clear his preference for corroborating materials like written reports or dash cam recordings of the marked lane violations, the absence of these materials is of no moment if the Court finds Agent Laughlin credible. Which it does. Credible testimony is evidence. *See United States v. Navarro-*

*Camacho*, 186 F.3d 701, 705 (6th Cir. 1999) (officer had probable cause for traffic stop based on officer's credible testimony about traffic violation); *United States v. Braswell*, 704 F. App'x 528, 532-33 (6th Cir. 2017) (officer had probable cause for traffic stop, even if video did not clearly show traffic violations, where officer credibly testified he observed traffic violations).

The Court finds the traffic stop was supported by probable cause and therefore lawful under the Fourth Amendment.

    **B.**    **Duration of the Stop**

Police activity during an investigatory stop must be reasonably related to the circumstances that initially justified the stop. *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *Florida v. Royer*, 460 U.S. 491, 500 (1983); *Dorsey v. Barber*, 517 F.3d 389, 398 (6th Cir. 2008). Any temporary detention resulting from the stop must be limited to the time required to investigate the reason for the stop. *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005). A constitutional stop can "become an impermissible seizure if it occurs over an unreasonable period of time or under unreasonable circumstances." *Id.* (citations and quotations omitted).

During traffic stops, police may ask questions or request documents to establish a person's identity. *Adams v. Williams*, 407 U.S. 143, 146 (1972). Requests to produce a driver's license and registration, and running a warrants check, do not exceed the scope of a traffic stop. *United States v. Hill*, 195 F.3d 258, 269 (6th Cir. 1999). Questions unrelated to the traffic stop, like where are you coming from, are also permissible as long as they do not delay the resolution of the traffic infraction. *United States v. Stepp*, 680 F.3d 651, 662 (6th Cir. 2012).

Police may also remove a driver from the vehicle during a traffic stop. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977); *Michigan v. Long*, 463 U.S. 1032, 1047-48 (1983); *Street*, 614. F.3d at 232. Passengers can be removed from the vehicle as well. *Maryland v. Wilson*, 519

U.S. 408, 413 n.1, 414-15 (1997); *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016). And police can ask both the driver and passenger for identification, even where they have no reasonable suspicion regarding the passenger. *United States v. Smith*, 601 F.3d 530, 542 (6th Cir. 2010).

Deploying K9s during a traffic stop is permissible so long as the K9 does not extend the duration of the stop beyond the time necessary to address the underlying traffic violation. *Rodriguez v. United States*, 575 U.S. 348, 354-57 (2015) (the critical question is whether the dog sniff adds time to the stop); *see also United States v. Bell*, 555 F.3d 535, 538-42 (6th Cir. 2009) (stop not improperly extended where dog sniff began approximately twelve minutes into the traffic stop and alerted 38 seconds later); *United States v. Stubblefield*, 682 F.3d 502, 506 (6th Cir. 2012) (stop not improperly extended where dog sniff occurred within five minutes of traffic stop); *United States v. One Million, Thirty-Two Thousand, Nine Hundred Eighty Dollars in U.S. Currency ($1,032,980.00)*, 855 F. Supp. 2d 678, 697 (N.D. Ohio 2012) (stop not improperly extended where dog sniff ended within seven minutes from beginning of traffic stop).

In the seven years he has been with OSHP, Trooper Hershman estimated conducting anywhere from 4,000 to 5,000 traffic stops. Based on his experience, traffic specific stops are typically completed in about 10 to 15 minutes. Here, the traffic stop was initiated at 3:29:47. The K9 alerted at 3:33:53. Trooper Hershman testified—and the recording supports—he was getting back into the car with Pouliot to conduct a warrants check when the K9 alerted to the presence of narcotics. The Court finds Trooper Hershman credible.

Burgman contends Trooper Hershman impermissibly delayed the stop by speaking to Burgman as Burgman was escorted to the second vehicle. The recording reveals this exchange between Officer Trooper and Burgman was only approximately 21 seconds long. (Def't Ex. B at

8

3:30:20-3:30-41.) And to the extent Burgman suggests the delay was intentionally done to extend the stop for the free air sniff, the argument similarly fails.

All the events about which Burgman complains occurred within 61 seconds. Trooper Hershman left Pouliot in his vehicle at 3:32:52. (*Id.* at 3:32:52.) The K9 approached the Trailblazer while Burgman was walking back to the other cruiser, and the K9's work ended at 3:33:53. (Def't Ex. A at 3:33:38-3:33:53.) As the K9 was being rewarded for hitting on the vehicle, Trooper Hershman was getting into the vehicle with Pouliot. (*Id.*) There is no evidence the stop was delayed or improperly extended.

The government alternatively argues any delay was supported by reasonable suspicion, largely focusing on indicia of nervousness and conflicting statements. Having found no impermissible delay, the Court need not address this argument. *See Bell*, 555 F.3d at 541 (even absent reasonable suspicion, dog sniff was not unlawful where defendant was not unreasonably delayed beyond purpose of initial stop). Additionally, only 61 seconds passed between Trooper Hershman putting Pouliot in the vehicle and getting into the vehicle himself. There is no dispute the K9's detection of narcotics gave the officers probable cause to extend the stop and search the vehicle. *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir.1994) (alert by properly trained drug-detection dog sufficient to establish probable cause to search car).

### III. CONCLUSION

For the reasons stated herein, Defendant's Motion to Suppress is DENIED.

**IT IS SO ORDERED.**

**Date:** February 28, 2025

                                                       BRIDGET MEEHAN BRENNAN
                                                       UNITED STATES DISTRICT JUDGE